UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| EDWARD LEFLORE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 1:20-cv-00910-SEB-MPB |
| JENNIFER RINEHART, | ) ) ) |
| Defendant. | ) ) |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Edward LeFlore was permanently banned from a United States Department of Labor ("USDOL") apprenticeship program for writing a letter to USDOL complaining about the program before exhausting the apprenticeship complaint process at his prison. Mr. LeFlore knew that he needed to exhaust the complaint process and that he could be removed from the program for complaining directly to USDOL. He was told how to complete the complaint process and was not prevented from doing so by prison officials.

The issue is whether the complaint process was a reasonable restriction on Mr. LeFlore's First Amendment rights. It was. First, the restriction was rationally related to the need for an orderly complaint process and established respect for the program's chain-of-command. Second, Mr. LeFlore had other ways to complain about the program, and he could have raised those complaints to USDOL if he was dissatisfied with the responses from state officials. Third, removing the restriction would reverse the structure of the complaint process and conscript USDOL officials into service as state prison grievance officers. Finally, there was not a ready alternative to the restriction. For these reasons, the defendant's motion for summary judgment is **GRANTED**.

## I. SUMMARY JUDGMENT STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Cmty. Schools*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

## II. BACKGROUND

### A. USDOL Apprenticeship Program

The Indiana Department of Correction ("IDOC") offers USDOL apprenticeship programs at its prisons. Dkt. 55-1, para. 2. USDOL creates standardized programs for prisoners that are adopted by participating states. *Id.* These programs teach prisoners job skills, help them make career plans, provide them with mentorship, and prepare them to find steady jobs upon reentry. *Id.* at para. 3. Prisoners must follow the program's rules to stay enrolled. *Id.* at para. 6; dkt. 55-2, p. 9; dkt. 55-3, p. 12. These rules are set by IDOC. *Id.* at para. 4; dkt. 55-2; dkt. 55-3.

IDOC requires participants to complete an internal apprenticeship complaint process before contacting USDOL directly. Dkt. 55-2, p. 13. The process has four steps: First, prisoners must complain to their immediate supervisor. Then to the Apprenticeship Program Coordinator. Then to the Apprenticeship Supervisor. And finally, to the IDOC Office of Apprenticeship. *Id.* After participants have exhausted these steps, they may contact USDOL about their complaints. *Id.*

### B. Mr. LeFlore's Apprenticeship Orientation

In 2015, Mr. LeFlore enrolled in an office manager apprenticeship program at his prison. Dkt. 70, para. 1. He attended an orientation seminar and learned that he had to follow the rules of his program to stay enrolled. *Id.* at paras. 2-3. He signed several documents at this seminar acknowledging that he understood these rules. *Id.*

One of these documents described the apprenticeship complaint process. *Id.* at para. 3; dkt. 55-4. This document stated: "Apprentices are prohibited from directly contacting the U.S. Department of Labor to address concerns or complaints without first following all steps of the IDOC/DOL complaint process. Failure to follow this process below may affect program completion and result in loss of time cut." *Id.* The document had a flowchart showing the four steps of the complaint process: immediate supervisor, Apprenticeship Program Coordinator, Apprenticeship Supervisor, and IDOC Office of Apprenticeship. *Id.* The document informed Mr. LeFlore that the Apprenticeship Program Coordinator was Sgt. Aaron Smith. *Id.* It also provided the mailing address for the IDOC Office of Apprenticeship. *Id.*[1]

---

[1] In response to a public records request, an official from Mr. LeFlore's prison stated that Sgt. Aaron Smith was the Apprenticeship Supervisor from July 2014 to June 2015. Dkt. 70-1, p. 21. Dkt. 55-4. Another public records request response states that Sgt. Aaron Smith "was a Program Coordinator 3 until he was promoted to Administrative Assistant 2 on 8/12/2018." Dkt. 70-1, p. 24. Mr. LeFlore signed his orientation documents, including the form identifying Sgt. Smith as the Apprenticeship Coordinator, in May 2015. He sent his letter to USDOL in April 2016. Dkt. 55-6.

3

Another document laid out Mr. LeFlore's responsibilities as a participant in the apprenticeship program. Dkt. 55-5. One of these responsibilities was having "respect for the appropriate chain of command." *Id.* To that end, "all Apprenticeship or work-related questions and/or concerns are to be brought to the attention of the Apprentice's immediate supervisor and if not resolved, the Apprentice will go to the Apprenticeship Coordinator." *Id.*

### C. Mr. LeFlore's Complaints about his Apprenticeship Program

Mr. LeFlore believed that his immediate supervisor was a fellow prisoner named Stanley Crumble. Dkt. 70, para. 6. On several occasions, Mr. LeFlore told Mr. Crumble that the program materials were deficient. *Id.* at para. 7. In response, Mr. Crumble told Mr. LeFlore not to worry and to focus on the time cut he would receive for completing the program. *Id.*

Mr. LeFlore was frustrated by Mr. Crumble's responses and decided to send a letter raising his concerns to USDOL and the Indiana Department of Labor—without raising those concerns to the Apprenticeship Program Coordinator, the Apprenticeship Supervisor, or the IDOC Office of Apprenticeship. *Id.* at para 8.

In the letter, Mr. LeFlore asked "why the materials supplied to this institution are grossly outdated and rife with misspellings, improper grammar, and incorrect sentence syntaxes." Dkt. 55-6. He went on to say, "When I arrived to this facility, I discovered that I was functionally illiterate and have been diligently working ever since to improve . . . Unlike some of the inmates here that only take these courses to get time subtracted from their sentences, I am actually interested in learning and profiting from it." *Id.* He asked for someone to "look into this matter and, if possible, get some updated and grammatically correct materials sent to" his facility. *Id.*

An Apprenticeship Training Representative for USDOL responded to Mr. LeFlore's letter. Dkt. 55-7. She told Mr. LeFlore that "the specific quality of the contents [of the program] was

4

developed and is monitored by the IDOC Office of Apprenticeship." *Id.* at 1. She noted that Mr. LeFlore's office manager apprenticeship program was standardized statewide and that to her knowledge, he was the first person to raise a complaint. *Id.* She reminded Mr. LeFlore that IDOC has an apprenticeship complaint process that he needed to follow. *Id.* Finally, she let him know that she would forward his complaint to the IDOC Office of Apprenticeship for their review. *Id.* at 2; dkt. 55-8.

After state officials looked into Mr. LeFlore's complaints, they agreed that the issues he raised were legitimate and decided to reform the program. Dkt. 55-10. In a letter to the prison's Apprenticeship Program Coordinators, an IDOC official wrote, "We are in agreement that the material is out of date and that due to the necessity of our situation the practical hands on training is somewhat lacking." *Id.* The program was suspended for several months until the materials could be updated: "We regret that a suspension of services is necessary but believe that the concerns that have been raised have validity and we would rather take our time to offer the best program possible than rush through a flawed product." *Id.* Regarding Mr. LeFlore, "We also regret that Offender LeFlore's actions constitute a violation of his apprenticeship agreement and his acknowledgement of the complaint process and as such will be removed." *Id.*

### D.  Mr. LeFlore's Attempt to Reenroll in the Apprenticeship Program

The defendant in this action is Sgt. Jennifer Rinehart. She was an Apprenticeship Program Coordinator at Mr. LeFlore's prison from 2015 to 2020. Dkt. 55-1, para. 2.

In April 2019, Mr. LeFlore asked his caseworker to refer him back to the apprenticeship program. Dkt. 70, para. 10. Sgt. Rinehart denied this referral and told Mr. LeFlore that he was permanently banned from the apprenticeship program for sending a letter to USDOL before exhausting the apprenticeship complaint process. Dkt. 55-1; dkt. 55-9, p. 1. In a follow-up letter

to Mr. LeFlore a few weeks later, Sgt. Rinehart stated, "With you violating the Apprenticeship Complaint process, you put the entire DOL program at risk for being shut down. The Office Manager program was shut down for approximately 1 year because of your inability to follow rules that you signed acknowledgment of on 05/07/2015." Dkt. 55-9, p. 2.

### III. DISCUSSION

Mr. LeFlore is suing Sgt. Rinehart for retaliation in violation of the First Amendment. Dkt. 9, p. 3. To prevail on this claim, he must show that his letter to USDOL was protected First Amendment activity, that Sgt. Rinehart's decision to ban him from the program would have deterred a reasonable person from engaging in protected activity, and that his letter to USDOL was at least a motivating factor in the decision to take retaliatory action. *Manuel v. Nelley*, 966 F.3d 678, 680 (7th Cir. 2020).

The parties agree on many of the material facts: Mr. LeFlore wrote a letter to USDOL before exhausting the apprenticeship complaint process, and Sgt. Rinehart refused to let him reenroll in the program because he wrote this letter. Ms. Rinehart argues, among other things, that she did not ban Mr. LeFlore from reenrolling because of protected speech; she banned him because writing a letter directly to USDOL violated the rules of the apprenticeship program. Dkt. 55, p. 7.

The issue is whether Mr. LeFlore's letter to USDOL was protected First Amendment activity. Or put differently: was the prison's enforcement of the apprenticeship complaint process, which requires participants to raise their complaints internally before contacting USDOL, a reasonable restriction on Mr. LeFlore's First Amendment rights?

### A. First Amendment Standard

A restriction on a prisoner's First Amendment activity is constitutional if the restriction is "reasonably related to a legitimate penological interest." *Shaw v. Murphy*, 532 U.S. 223, 225

6

(2001) (quoting *Turner v. Safley*, 482 U.S. 78 (1987)). In considering whether a First Amendment restriction is reasonable, courts consider four factors:

First, there must be a "valid, rational connection" between the prison regulation and the legitimate penological interest put forward to justify it. *Turner*, 482 U.S. at 89. Thus, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89-90.

Second, courts consider whether the prisoner has alternative means of exercising the constitutional right that is restricted by the regulation. *Id.* at 90. When other avenues are available, courts should be particularly conscious of the measure of judicial deference owed to correctional officials in gauging the validity of the regulation. *Id.*

Third, courts consider the impact that an accommodation of the First Amendment right will have on correctional staff and other inmates. *Id.* When the accommodation will have significant "ripple effects," courts should be particularly deferential to the informed discretion of correctional officials. *Id.*

Fourth, courts consider whether there are alternative ways of accommodating the prisoner's constitutional rights without sacrificing legitimate penological interests. *Id.* The absence of ready alternatives is evidence of the reasonableness of a prison regulation. At the same time, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* This is not a "least restrictive alternative" test, as prison officials are given broad deference to administer their facilities. *Id.* at 90-91. But when the plaintiff "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

### B. Analysis

Internal complaint processes are facts of prison life. For example, the Prison Litigation Reform Act requires prisoners to exhaust their available administrative remedies before exercising their right to sue over the conditions of their confinement. 42 U.S.C. § 1997e(a); *See Porter v. Nussle,* 534 U.S. 516, 524-25 (2002). The Antiterrorism and Effective Death Penalty Act requires prisoners to exhaust their prison's administrative appeals process before challenging a prison disciplinary conviction in federal court. 28 U.S.C. § 2254(b)(1)(A); *Moffat v. Broyles*, 288 F.3d 978, 981 (7th Cir. 2002). These processes help prisoners and prison official resolve complaints in an efficient and orderly fashion. *Cf. Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (reasoning that "no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings").

With this in mind, the Court now considers whether the apprenticeship complaint process was a reasonable restriction on Mr. LeFlore's First Amendment rights. Mr. LeFlore had to raise his complaints through four levels of review before contacting USDOL. The process was rationally related to the legitimate interest of ensuring an orderly complaint process. It also taught prisoners to respect the apprenticeship program's chain-of-command—a skill they will need if they want to hold down a steady job. Teaching respect for chain-of-command thus goes to the heart of the apprenticeship program's essential purpose of teaching prisoners job skills to prepare them for success upon reentry.

Mr. LeFlore had other ways of exercising his First Amendment rights. He could have complained to his immediate supervisor, his Apprenticeship Program Coordinator, his Apprenticeship Supervisor, and the IDOC Office of Apprenticeship. Dkt. 55-4. If he was dissatisfied with their responses, he could have complained to USDOL. *Id.* Mr. LeFlore's ability

to communicate with USDOL was not completely prohibited. He just had to give state officials a chance to fix the problem before asking federal officials for help.

Removing the apprenticeship complaint process would have significant "ripple effects" on the apprenticeship program. The program is an example of federal-state cooperation. The federal government creates apprenticeship programs to prepare prisoners for success upon reentry, and participating states adopt these programs for their prisoners. Dkt. 55-1, paras. 2, 4; dkt. 55-2; dkt. 55-3. Many complaints can be resolved by state officials. Indeed, the USDOL representative told Mr. LeFlore that his complaint was a matter for state officials. *See* dkt. 55-7 (noting that "the specific quality of the contents [of the program] was developed and is monitored by the IDOC Office of Apprenticeship"). Allowing prisoners to contact USDOL directly, without raising their complaints through the apprenticeship complaint process, would reverse the complaint process for these programs and conscript USDOL officials into service as state prison grievance officers.

Mr. LeFlore has not shown a "ready alternative" to the apprenticeship complaint process. The process has a logical structure that requires prisoners to raise their complaints through progressively higher levels of review. The evidence does not suggest the process is so onerous that it prevents prisoners from eventually contacting USDOL directly.

To summarize, all four *Turner* factors support the conclusion that the apprenticeship complaint process was a reasonable restriction on Mr. LeFlore's First Amendment rights. Courts generally defer to prison officials to administer their facilities. Accordingly, the Court finds that the rule prohibiting prisoners from contacting USDOL before exhausting the apprenticeship complaint process was reasonable and that Mr. LeFlore's letter to USDOL was not protected First Amendment activity.

Mr. LeFlore makes two relevant arguments in his response brief. First, he argues that his immediate supervisor, Mr. Crumble, was the only person in the apprenticeship program that he had regular contact with, and that he did not know who else to turn to other than USDOL. Dkt. 69, pp. 4, 11, 13, 17-18. This argument is belied by the record. Mr. LeFlore signed a document acknowledging that he understood the apprenticeship complaint process. Dkt. 55-4. This document informed him that his Apprenticeship Program Coordinator was Sgt. Aaron Smith. *Id.* Although Mr. LeFlore argues that he "never saw [Sgt. Smith] engage in anything related to the Office Manager program," this is also belied by the record, as Sgt. Smith signed Mr. LeFlore's orientation paperwork that described the apprenticeship complaint process. Dkt. 55-4; *see also* dkt. 70, para. 9 (LeFlore affidavit, acknowledging that "Aaron Smith's name was listed on the Apprenticeship Complaint Process"). In any event, if Mr. LeFlore needed more information about the apprenticeship complaint process, he should have asked for help from prison officials. There is simply no evidence that prison officials kept him from completing the apprenticeship complaint process.

Second, Mr. LeFlore argues that he was never told he would be permanently banned from the apprenticeship program for violating the program's rules. His understanding was that he could be removed from the program, but that he would be allowed to reenroll and start over. Dkt. 69, pp. 16, 17-18. This argument is unpersuasive. To prevail on his First Amendment retaliation claim, Mr. LeFlore has to show that he engaged in protected First Amendment activity, which he has failed to do. Whether his punishment for breaking the rules was more severe than he anticipated is not relevant because the severity of the punishment has no bearing on whether his letter to USDOL was protected First Amendment activity. To the extent that he frames the issue as a claim of excessive punishment, this claim fails because prisoners have no due process or Eighth

10

Amendment right to participate in vocational programming. *See Walker v. Samuels*, 543 F. App'x 610, 611 (7th Cir. 2013) (vocational programming is not one of "life's necessities" for purposes of the Eighth Amendment); *Johnson v. Randall*, 451 F. App'x 597, 599 (7th Cir. 2011) (no due process right to vocational programming in prison); *Zimmerman v. Trimble*, 226 F.3d 568, 571 (7th Cir. 2000) ("There is no constitutional mandate to provide educational, rehabilitative, or vocational programs, in the absence of conditions that give rise to a violation of the Eighth Amendment.").

Mr. LeFlore's letter to USDOL was not protected First Amendment activity, and the motion for summary judgment is **GRANTED**.

The Court commends Mr. LeFlore on the quality of his briefing and designated materials. His writing is clear and well-organized, his use of legal authorities is skillful, and his efforts to improve his reading and writing are self-evident. It is unfortunate that he will not benefit from the improvements to the office manager program brought about by his complaints. The Court hopes that he continues to improve himself and wishes him success upon reentry.

### IV. CONCLUSION

The defendant's motion for summary judgment, dkt. [54], is **GRANTED**. Final judgment in accordance with this Order shall now issue.

**IT IS SO ORDERED**.

Date:   3/9/2022

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

EDWARD LEFLORE
942371
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Brandyn Lee Arnold
INDIANA ATTORNEY GENERAL
brandyn.arnold@atg.in.gov

Brandon Carothers
INDIANA ATTORNEY GENERAL
bcarothers@atg.in.gov

Thomas Joseph Flynn
INDIANA ATTORNEY GENERAL
tom.flynn@atg.in.gov